UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

                                )

                                )

UNITED STATES OF AMERICA      )

                                )

v.                                  )      No. 25-CR-10334-MJJ

                                )      Leave to File Granted on

STEVEN WAYNE TOMPKINS,     )      October 20, 2025

      Defendant            )

                                )

_____ )

## **MOTION TO SUPPRESS**

Now comes the defendant Steven Tompkins, by and through undersigned counsel, and, pursuant to Fed. R. Crim. P. 41 and the Fourth Amendment to the United States Constitution, hereby respectfully moves this Honorable Court to suppress all evidence seized pursuant to the search warrants for Mr. Tompkins's Comcast and Google email accounts. There are four independent grounds for suppression.

First, for reasons similar to those set forth in a pending Motion to Dismiss, *see generally* Dkt. 28, the affidavits submitted in support of the search warrants fail to establish probable cause to believe that Mr. Tompkins engaged in *quid pro quo* bribery, *i.e.*, a promise to exchange his official acts for payment. Rather, the alleged facts suggest that the equity interest in Company A received by Mr. Tompkins and subsequent refund of his investment were at most gratuities, beyond the scope of the federal bribery statutes.

Second, assuming *arguendo* and contrary to the above that the affidavits as written were minimally sufficient to establish probable cause, they recklessly omitted material information that, if truthfully disclosed, would have defeated such probable cause finding. The affidavits do

1

not mention the fact that Company A's participation in the Suffolk County Sheriff Department's ("SCSD") pre-existing re-entry program was memorialized by Mr. Tompkins in a September 2019 letter, pre-dating by months any discussion of his receipt of an equity interest in Company A. This timing significantly reinforces the defense argument that the facts alleged at most constitute a gratuity, not a bribe. The affidavits also failed to disclose that Company A relied upon several independent means of satisfying the positive impact plan ("PIP") requirement other than the SCSD re-entry program, undercutting the allegation that Mr. Tompkins and Individual A entered into a bribery agreement in order to satisfy that requirement. In fact, contrary to the affidavits' repeated characterization of the relationship as "ongoing," Company A removed any reference to the SCSD's re-entry program from its PIP submission prior to the execution of the first affidavit. Finally, the affidavits failed to inform the magistrate judge that, at the time Mr. Tompkins requested a refund of his investment, the value of the Company A shares he allegedly had an interest in exceeded the $50,000 he asked for, undermining the government's allegation that the refund request constituted an extortionate demand.

Third, the government, operating under what appears to be a regular practice in this District, engaged in a seize now, narrow later approach akin to the very general warrants that the Fourth Amendment was specifically intended to proscribe. The warrants employ two steps. First, they called for Comcast and Google to produce *all* the documents from Mr. Tompkins's email accounts without even any date restriction. Then, they set out a somewhat narrower (but still exceedingly broad) series of categories of items "to be searched and seized by law enforcement." But a Constitutional search occurred at the first step of the warrant, and there is no plausible argument that the government had probable cause to obtain the full contents of Mr.

2

Tompkins's email accounts.

Fourth, even the purportedly narrower categories set forth in the second step of the warrants far exceeded the bounds of any probable cause. They authorized government review of communications dating back to 2013 (for Comcast) and 2016 (for Google) and were not limited to the suspected bribery involving Individual A in November 2020. To the contrary, the warrants expressly included any and all evidence of, *e.g.*, state ethics violations, beyond the scope of any relevant federal statute.

Because the warrants issued based, in part, on recklessly omitted information, and because no reasonable officer could have believed in the validity of a warrant that purported to authorize the search and seizure of Mr. Tompkins's entire email accounts, the good-faith exception to the exclusionary rule does not apply. The remedy for such general warrants is total, not partial, suppression.

As further grounds and reasons for his Motion, Mr. Tompkins incorporates the below Memorandum of Law.

## REQUEST FOR HEARING

Mr. Tompkins respectfully requests that the Court hold oral argument on this Motion, as well as a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## MEMORANDUM OF LAW

### A.    Background

On February 15, 2024, the government applied for and obtained a search warrant for Mr. Tompkins's Comcast email account records. The application was based on an affidavit executed by FBI Special Agent Robet Erwin, attached hereto as Exhibit A. The affidavit asserted that

3

Agent Erwin was investigating Mr. Tompkins and others "for public corruption and tax crimes,"[1] including suspected federal programs bribery, honest services wire fraud, Hobbs Act extortion, and sale of unregistered securities.[2]  Exhibit A ¶ 2.

At the outset of its statement of probable cause, the affidavit specified that investigation "ha[d] revealed that, in or about November 2020," Mr. Tompkins "illegally invested $50,000 in a then-non-public company," referred to in the Indictment as "Company A," "a national cannabis cultivation and retail company that was owned by a political ally," referred to in the Indictment as "Individual A."  *Id.* ¶ 7.  More specifically, on November 9, 2020, Mr. Tompkins "wired $50,000 from his Fidelity retirement account payable to" Individual A's lobbying Company.  *Id.* ¶ 24.  In 2022, when Mr. Tompkins was facing a re-election campaign, Individual A paid the $50,000 back to Mr. Tompkins in a series of five checks, spanning May 2022 to July 2023.  *Id.* ¶¶ 26-27.  The affidavit did not mention that, taking the government's own allegations in the Indictment in this matter at face value, when Mr. Tompkins requested the refund, the shares of Company A stock were actually worth more than the $50,000 repayment he requested.  *See* Dkt. 28 at 7-8.  The affidavit alleged that Individual A's "sale of risk-free [Company A] securities – whose cannabis company . . . was acting in partnership with the SCSD – to [Mr. Tompkins] – who, as Sheriff sanctioned SCSD's participation in [Company A's] PIP program – was contrary

---

[1] The affidavit does not mention any such "tax crime[]," much less establish probable cause to believe that Mr. Tompkins committed any such offense.

[2] Mr. Tompkins is not charged with any securities offense.  This follows from the affidavit's allegation that it was Company A, not Mr. Tompkins, that "was required to file Form D (under the Exchange Act) with respect to . . . non-public sales of its securities."  Exhibit A ¶ 22.

to federal bribery laws which prohibit corrupt payments made as part of a quid pro quo arrangement with a public official . . . ." *Id.* ¶ 32.

The affidavit alleged that Mr. Tompkins "play[ed] an integral role in [Company A's] PIP, and thus, [Company A's] continued re-licensure in Massachusetts." *Id.* ¶ 20. Companies seeking licensure from the Cannabis Control Commission ("CCC") in communities that "have been disproportionately impacted by cannabis prohibition and enforcement (e.g., Boston)" must "establish a plan to 'positively impact areas of disproportionate impact, as defined by the [CCC].'" *Id.* ¶ 18. When seeking renewal licensure, a cannabis company must "demonstrate that its PIP has actually been put into practice with measurable results." *Id.* ¶ 19. The affidavit alleged that "[p]ublic records pertaining to" Company A "revealed that the PIP for [Company A's] Boston cannabis dispensary relie[d] significantly upon its planned, and ongoing partnership with the SCSD and [Mr. Tompkins]." *Id.* ¶ 20. Company A's original April 2020 CCC application stated that, "[i]n partnership with [SCSD] Sheriff Steven W. Tompkins, [Company A] intend[ed] to hire ex-offenders from the Suffolk County House of Corrections that have completed job-training and re-entry programs to work within [Company A's] dispensary and who otherwise meet [Company A's] criteria for employment. . . ." *Id.* The affidavit asserted that, "based upon," *inter alia*, "[Company A's] reliance upon [Mr. Tompkins] and the SCSD to fulfill its PIP obligations to the CCC" and Mr. Tompkins's "power and official authority to decide the SCSD's ongoing partnership with [Company A], . . . there is reasonable cause to believe that [Individual A] engaged in a pay-to-play scheme with [Mr. Tompkins] by secretly selling [Mr. Tompkins] $50,000 of [Company A] securities in exchange for [Mr. Tompkins's] continued official actions in support of the [Company A]-SCSD partnership." *Id.* ¶ 21.

5

Left unsaid in the affidavit is that, as detailed in a prior filing, all of Company A's applications to the CCC relied upon alternative means of satisfying the PIP requirement, entirely independent of participation in the SCSD's pre-existing re-entry program. *See* Dkt. 28 at 3-4; Dkt. 28, Exhibit B (citing program to "contribute 0.5% of . . . net revenue to the WeGrow Foundation," which would "support eligible organizations and programs that provide service to," *inter alia*, "[p]ast or present residents of the geographic 'areas of disproportionate impact,' which have been defined by the Commission," and "Massachusetts residents who have past drug convictions"); Exhibit C (adding partnership with "The Last Prisoner Project . . . , a non-profit, cannabis criminal justice reform organization" and holding of "CORI expungement and record sealing clinics"); Exhibit D (adding partnership "with MasscultivatED to hire formerly incarcerated individuals who have convictions for non-violent drug offenses" and omitting the SCSD as a standalone PIP program); Exhibit E (omitting any reference to the SCSD re-entry program and adding "[p]artnerships with social equity licensees to provide technical assistance").

The affidavit's only factual allegations regarding Mr. Tompkins's conduct pre-dating 2020 are patently insufficient to create probable cause to believe that he engaged in bribery. First, the affidavit cited two alleged violations of Massachusetts state ethics laws, completely unrelated to any alleged bribery. *See* Exhibit A ¶¶ 10-11. The affidavit also alleged, without providing any specifics whatsoever, that Mr. Tompkins's "campaign finance records . . . revealed dozens of audit letters which reported several campaign account discrepancies from 2013 to 2023." *Id.* ¶ 44. Relatedly, the affidavit stated that "former SCSD employees alleged that [Mr. Tompkins] fostered a pay-to-play culture within SCSD where SCSD employees felt compelled to donate to [Mr. Tompkins's] political campaigns for fear of retaliation or negative employment

consequences." *Id.* ¶ 12.  The allegation appears to be based solely on a news article from

August 2016.  *See* Eric Rasmussen and Erin Smith, Fox 25 Investigates 'pay to play' allegations

at Suffolk County Sheriff's Office, Boston 25 News (Aug. 24, 2016).[3]  Third, the affidavit

contained various allegations regarding the relationship between Mr. Tompkins and Individual

A.  "[F]rom 2013 to 2022," Individual A "personally donated $2,500" to Mr. Tompkins's

campaigns, while employees at Individual A's lobbying company donated another $1,950.

Exhibit A ¶ 14.  Additionally, from 2013 to 2023, Mr. Tompkins's campaign paid Individual A's

lobbying company, which helped public officials conduct campaigns, "over $95,000 for

'consulting services.'"  *Id.* ¶ 15.  Mr. Tompkins's campaign and Individual A's lobbying

company also shared the same business address.  *See id.*  Finally, the affidavit alleged that there

were hundreds of email communications between Mr. Tompkins and Individual A or other

individuals associated with his lobbying company between 2013 and 2023.  *See id.* ¶ 37.  There

were also emails between Mr. Tompkins and other "principals of" Company A between 2013

and 2023.  *Id.* ¶ 38.

     The affidavit sought to leverage the foregoing sparse and generic allegations to obtain

essentially *carte blanche* authority to search the entire contents of Mr. Tompkins's email account

for evidence of virtually any official wrongdoing.  The affiant asserted, "when public officials

like [Mr. Tompkins] use their public office to unlawfully enrich themselves, it is usually not

done on an isolated basis.  That is, it is common for public officials like [Mr. Tompkins] –

himself, previously cited for multiple ethics violations, previously accused of pressuring SCSD

---

[3] *Available at* https://www.boston25news.com/news/fox25-investigates-pay-to-play-allegations-at-suffolk-county-sheriffs-office/428970403/.

employees to donate to his political campaigns, and presently involved in an alleged pay-to-play scheme involving [Company A] – to commit similar unlawful acts." *Id.* ¶ 43. Lacking probable cause of a specific federal offense, the affiant instead filled the void with assorted unrelated and often unproven allegations about ethics and elections violations far outside the ambit of federal criminal jurisprudence.

Magistrate Judge Kelley issued the warrant to Comcast, attached hereto as Exhibit B. Attachment B to the warrant called for Comcast to produce the full contents Mr. Tompkins's email account, without even any date limitation. *See* Exhibit B at 4-5 (calling for Comcast to copy and produce "[a]ll data files associated with the target account within the possession, custody, or control of the Company . . . ," including but not limited to all emails, "text or instant messages," "calendar data," and "all [other] electronic data files"). A subsequent section of Attachment B, titled "Records and Data to be Searched and Seized by Law Enforcement Personnel," set forth a (marginally) more limited category of data subject to search, namely all "[e]vidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 666(a)(1)(B) (federal programs bribery); 18 U.S.C. §§ 1343, 1346 (honest services wire fraud); 18 U.S.C. § 1951 (extortion under color of official right); and 15 U.S.C. § 77e (sale of unregistered securities), including records from January 1, 2013 through the present . . . ." Exhibit B at 6.

The document went on to enumerate nine non-exclusive categories of information subject to search, many entirely extrinsic to a federal offense for which any attempt at a probable cause showing was set forth, including the following:

1.    All communications between and/or among [Mr. Tompkins], [Individual A], present and former employees and/or agents of [Individual A's companies, Company A], the SCSD, the CCC, [the Massachusetts Office of Campaign and Political Finance ("OCPF")], [Mr. Tompkins's] campaign or campaign committee, and/or the MA State Ethics Commission;

2.    All communications about and/or pertaining to [Mr. Tompkins's] finances, lending, borrowing, expenses, investing, investments, real estate, [Company A], [Company A] stock and/or other [Company A] securities, the CCC, the SCSD, the PIP program, [Individual A's companies], campaign finances, the OCPF, [Mr. Tompkins's] campaign and/or campaign committee, [Mr. Tompkins's] food, travel, and entertainment, and/or ethics violations . . . .

*Id.* at 6-7.

On March 15, 2024, the government sought and obtained a second search warrant, this one for Mr. Tompkins's Google email account.  The warrant issued based on a second affidavit by Agent Erwin, materially indistinguishable from the first, and attached hereto as Exhibit C. Among other minor changes, the Google affidavit enumerated communications with relevant parties dating back to 2016 (rather than 2013).  *See* Exhibit C ¶¶ 37-38, 40.

Magistrate Judge Kelley issued the second warrant, attached hereto as Exhibit D.  The warrant prescribed the same two-step process as the first one directed to Comcast.  The first step called for Google to produce "[a]ll data files associated with" Mr. Tompkins's account, with no date limitation.  Exhibit D at 4.  A subsequent section of the warrant attachment purported to specify "Records and Data to be Searched and Seized by Law Enforcement Personnel" materially identical to those set forth *supra* with respect to the Comcast warrant, with the primary change being the date range beginning January 1, 2016 (rather than 2013).  *Id.* at 7-8.

**B.    Legal Standard**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

The probable cause standard requires "more than bare suspicion."  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  Rather, probable cause "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Id.* at 175-76 (citation omitted).  Application of a lesser standard would "leave law-abiding citizens at the mercy of the officers' whim or caprice."  *Id.* at 176.  Absent exigent circumstances, the probable cause determination must be made by a "neutral and detached magistrate."  *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (citation omitted).  And officers must present sufficient information to that magistrate to allow it to conduct the required analysis.  In other words, the magistrate's "action cannot be a mere ratification of the bare conclusions of others."  *Id.* at 239.

The Fourth Amendment's particularity requirement is intended to "make[] general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  *Marron v. United States*, 275 U.S. 192, 196 (1927).  "Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the

Crown had so bedeviled the colonists. . . .  They were denounced by James Otis as 'the worst

instrument of arbitrary power, the most destructive of English liberty, and the fundamental

principles of law, that ever was found in an English law book,' because they placed 'the liberty of

every man in the hands of every petty officer.'"  *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

"[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general,

exploratory rummaging in a person's belongings . . . ."  *United States v. Fuccillo*, 808 F.2d 173, 175

(1st Cir. 1987) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  "The particularity

requirement demands that a valid warrant: (1) must supply enough information to guide and control

the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too

broad in the sense that it includes items that should not be seized."  *United States v. Kuc*, 737 F.3d

129, 133 (1st Cir. 2013).  In order to satisfy the second requirement, "a search must be confined in

scope to particularly described evidence relating to a specific crime for which there is demonstrated

probable cause."  *United States v. Burdulis*, 753 F.3d 255, 260 (1st Cir. 2014) (citation omitted).

## C.     Argument

### 1.     *The affidavits did not give rise to probable cause that Mr. Tompkins was involved in any bribery scheme*

Mr. Tompkins has a pending Motion to Dismiss the Indictment in this case on the

grounds that the alleged facts, which largely consist of Mr. Tompkins's same receipt of an equity

interest in Company A and subsequent refund of his investment recounted in the affidavits at

issue here, do not constitute Hobbs Act extortion in violation of 18 U.S.C. § 1951.  More

specifically, Mr. Tompkins contends, *inter alia*, that his September 5, 2019 letter memorializing

Company A's participation in the SCSD re-entry program (which letter the affidavits do not so

much as mention) could not possibly have been part of any *quid pro quo* exchange for an equity

interest in Company A, which was not even mentioned between Mr. Tompkins and Individual A until months later. *See generally* Dkt. 28 at 12-16. The equity interest was, therefore, at most a gratuity insufficient to support conviction under longstanding First Circuit caselaw, *see, e.g.*, *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), and the Supreme Court's recent decision in *Snyder v. United States*, 603 U.S. 1 (2024). Additionally, neither the Indictment nor the affidavits identifies any cognizable "official act" promised by Mr. Tompkins in exchange for payment, as required under *McDonnell v. United States*, 579 U.S. 550 (2016). *See* Dkt. 28 at 17-22. The defense incorporates herein the foregoing arguments from its Motion to Dismiss and contends that, for these same reasons, the facts alleged in the affidavits do not establish probable cause to believe that Mr. Tompkins engaged in bribery.

### 2.    *The material omissions from the affidavits require a Franks hearing*

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (citation omitted). Indeed, the fundamental Constitutional protection of probable cause "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *Id.* at 168. Additionally, "[b]ecause it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Id.* at 165 (citations omitted).

A defendant is entitled to a hearing pursuant to *Franks* upon making "a substantial

preliminary showing that (1) a false statement, (2) knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and (3) the allegedly false statement is necessary to the finding of probable cause." *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (citation omitted). The "false statement" required by the first element may include "material omissions." *United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999). The affiant's "recklessness may be inferred where the omitted information was critical to the probable cause determination." *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005) (citation omitted).

Here, there are three material omissions from both affidavits. First, the affidavits fail to mention, as expressly alleged in the subsequent Indictment, that Mr. Tompkins memorialized Company A's participation in the SCSD's pre-existing re-entry program in a September 5, 2019 letter. This was important because Mr. Tompkins's signing of the letter pre-dated any alleged discussion of the possibility of Mr. Tompkins's obtaining an equity interest in Company A. The Hobbs Act, like other federal bribery statutes, requires *quid pro quo* bribery, meaning "the agreement to exchange a thing of value for an official act" must be "made before the act is performed." *United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022). No allegation is made nor could any be truthfully made of any agreement involving the purchase of stock as having occurred prior to or contemporaneous with the letter in question. The timing of Mr. Tompkins's letter suggests that his subsequent receipt of an equity interest was at most an after-the-fact gratuity, as opposed to a corrupt agreement to exchange an official act for payment. *See, e.g.*, *Snyder*, 603 U.S. at 6 ("[G]ratuities after the official act are not the same as bribes before the official act. After all, unlike gratuities, bribes can corrupt the official act—meaning that the official takes the act for private gain, not for the public good."); *Fernandez*, 722 F.3d at 19 ("[F]or bribery there must be a

13

*quid pro quo*—a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), *or for a past act that he has already taken*." (quoting *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05 (1999)).

There can be little doubt that the affiant's omission of Mr. Tompkins's September 2019 letter was, at minimum, reckless. As alleged in the Indictment, that letter was "submitted to the CCC in [Company A's] completed dispensary license application in or about March 2020." Dkt. 1 ¶ 10. The affidavits expressly rely upon "[p]ublic records pertaining to" Company A's CCC licensure applications. Exhibits A and C ¶ 20. In these circumstances, it is highly likely that the affiant had reviewed the September letter. *See Vigeant*, 176 F.3d at 573 (finding reckless omission where affiant "failed to note that [defendant] had filed the necessary CTR, yet included . . . minute details about the transaction" that "he presumably obtained from the CTR"). At the very least, the government certainly had access to the letter. *See id.* (finding reckless omission where affiant "could have (but did not) obtain [defendant's] employment status from the probation office . . . .").

Second, the affidavits both omitted the fact that all of Company A's CCC applications included alternative means of satisfying the PIP requirement, entirely independent of the SCSD. *See supra* page 6. In fact, in its January 2023 renewal application, submitted more than a full calendar year before the affidavits were executed, the SCSD's re-entry program was relegated to a single sentence at the end of the PIP's discussion of a similar initiative with an independent organization, MasscultivatED. *See* Dkt. 28, Exhibit D at 3. This de-emphasis of the SCSD was for good cause. While the affidavits quoted Company A's initial "goal . . . to hire six individuals

through this program," Exhibits A and C ¶ 20, in fact, Company A did not hire more than one

former inmate.  Had Company A's relationship with the SCSD truly been "integral" to its

satisfaction of the PIP requirement, *id.*, it would have come closer to meeting its commitment.  In an

application submitted in January 2024, weeks prior to the execution of the first affidavit, Company

A omitted any reference to the SCSD re-entry program altogether, relying exclusively on unrelated

initiatives.  *See* Dkt. 28, Exhibit E.  These omitted facts significantly undercut, and in fact directly

contradict, the affidavits' allegation that "the PIP for [Company A's] Boston cannabis dispensary

relies significantly upon its planned, and ***ongoing***, partnership with the SCSD and [Mr. Tompkins]."

Exhibits A and C ¶ 20 (emphasis added).  The affidavits quoted liberally from Company A's initial

PIP, but included only a single sentence (among many) relating to the alternative means of

satisfying that requirement discussed in the same filing.  *See id.*  The affidavits contained no hint of

the several additional alternatives introduced over time, or that Company A eventually removed the

SCSD re-entry program from its PIP submission entirely.

Clearly, omission of this information was at least reckless.  There is no doubt that the affiant

had reviewed Company A's PIP submissions, as evidenced by the fact that screenshots of the first

such submission were included in the affidavits.  And the affidavits certainly suggest that the

government had access to subsequent submissions as well, claiming that Mr. Tompkins played "an

integral role in . . . [Company A's] ***continued re-licensure***" and that Company A's PIP "relies

significantly upon its planned, ***and ongoing***, partnership with the SCSD . . . ."  Exhibits A and C

¶ 20 (emphasis added).

Third, the affidavits omitted the fact that, when Mr. Tompkins requested a refund of his

$50,000 investment, in "late 2021 to 2022," publicly available data demonstrates that Company A's

stock price remained above Mr. Tompkins's ostensible purchase price. Dkt. 28 at 7-8. The agreement between Mr. Tompkins and Individual A reflected "a per share price of approximately $3.46." Dkt. 1 ¶¶ 22-23. The value of Company A's stock exceeded $3.46 per share at all times in 2021 and until April 2022. *See* Dkt. 28, Exhibit F. This belies the affidavits' express allegation that, absent the refund from Individual A, Mr. Tompkins would have been required to "sell[] at a loss like any other [Company A] shareholder." Exhibits A and C ¶ 28. Given the readily available nature of the information and the affidavits' specific reliance upon data regarding Company A's share price, *see* Exhibits A and C page 14 n.11, the omission of this detail was, at least, reckless.

Finally, assuming *arguendo* and contrary to the argument *supra*, the Court concludes that the affidavits, as written, support a finding of probable cause, they do not support any such finding once the material omissions are corrected. The timing of Mr. Tompkins's undisclosed letter that Company A allegedly relied upon to satisfy the PIP requirement is highly suggestive of the conclusion that it could not have constituted a bribe and instead was at most a gratuity outside the federal bribery statutes. And the affidavits' assertion of probable cause was expressly predicated upon Company A's "reliance upon [Mr. Tompkins] and the SCSD to fulfill its PIP obligations to the CCC." Exhibits A and C ¶ 21; *see also id.* ¶ 38 (alleging SCSD's "pivotal role in [Company A's] ongoing PIP obligations"). The undisclosed facts outlined herein make it clear that such "reliance" was not nearly as significant as the affidavits suggest. The fact that Company A's share price was higher than Mr. Tompkins's ostensible purchase price when he requested repayment belies the government's allegation that the request constituted an extortionate demand punishable under the Hobbs Act.

16

3.     *The initial production of Mr. Tompkins's complete email accounts to the government violated the particularity requirement*

The two warrants each purported to include two-steps: first, the vendors (Comcast and Google) were required to produce all of Mr. Tompkins's records, without even any date range limitation; then, the warrants proceeded to outline a series of purportedly narrower (but still exceedingly broad) categories of information "to be searched and seized" by the government. The problem, of course, is that a seizure had already occurred at the first step, when the government demanded production of the full set of records. Otherwise, there would have been no need for a warrant at that stage. There can be no serious suggestion that probable cause existed for the seizure of Mr. Tompkins's full email accounts.

This seize now, narrow later approach appears to be a regular practice by the U.S. Attorney's Office in this District. *See, e.g.*, *United States v. Kanodia*, No. 15-CR-10131, 2016 WL 3166370, at *6-7 (D. Mass. June 6, 2016); *United States v. Klyushin*, 643 F. Supp. 3d 261, 270 (D. Mass. 2022). But the legal authority used to justify the procedure is far afield from the present context involving seizure of an entire email account without regard to even a limitation by date that any internet service provider or carrier could use to limit the production. In *United States v. Upham*, 168 F.3d 532 (1st Cir. 1999), officers executing a search warrant on the defendant's home seized his computer. The First Circuit rejected a defense argument that the warrant purporting to authorize such seizure lacked particularity because, "[a]s a practical matter, the seizure and subsequent off-premises search of the computer . . . was about the narrowest definable search and seizure reasonably likely to obtain" the suspected child pornography. *Id.* at 535.

17

Technology has advanced in the more than two decades since *Upham*, such that wholesale seizure of electronic evidence is sometimes far from the narrowest practical alternative. In the circumstances of this case, where Mr. Tompkins's data was remotely accessible via his email accounts, there was no evident reason why the government could not have constructed a narrower set of demands consistent with the scope of probable cause, which as discussed in detail below was quite limited to the extent it existed at all. Indeed, one district court has distinguished *Upham* and other similar cases from other circuits on the grounds that they "addressed the search of computers and hard drives, not email accounts." *United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, No. 17-CM-3152, 2017 WL 4322826, at *6 (M.D. Ala. Sept. 28, 2017). "'[H]ard drive searches require time-consuming electronic forensic investigation with special equipment' due to the myriad ways one can hide evidence on a hard drive." *Id.* (quoting *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017)). By contrast, "sorting [emails] by date or sender or recipient or even by keyword would be much easier than sorting data stored on a hard drive. As the DOJ's electronic search manual explains, investigators initially simply 'serve the warrant on the provider as they would a subpoena, and the provider produces the material specified in the warrant.'" *Id.* (quoting U.S. Dep't of Justice, *Searching and Seizing Computers and Electronic Evidence in Criminal Investigations* 134 (2009)); *see also Matter of the Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 25 F. Supp. 3d 1, 8 (D.D.C. 2014) ("[A] subpoena served on a third party, such as a bank, compels that entity to look within a record set for the particular documents sought. E-mail providers . . . are technologically sophisticated actors; in fact, . . . Google[] has created an entire business model

around searching the contents of e-mail in order to deliver targeted advertising, and it has done

so for a decade.").  In this context, a government "request for *all* data related to *all* the email

accounts is too broad.  It does not describe with particularity what will be searched—or, to the

extent it does, it does not establish a sufficient nexus between the place to be searched and the

probable cause that would allow it."  *Matter of Search of Info. Associated With Fifteen Email

Addresses*, 2017 WL 4322826, at *7.

Many federal district courts have held two-step warrants like those at issue here

overbroad for purporting to authorize wholesale seizure of electronic records held by third-party

vendors.  *See Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F.

Supp. 3d 843, 845 (D. Or. 2018) ("The Court finds that the search warrants challenged here,

which require Google to disclose to the government the 'contents of all emails associated with

the Email Account[s,]' are overbroad because it is unreasonable to compel a provider to disclose

every email in its client's account when the provider is able to disclose only those emails the

government has probable cause to search."); *In re [REDACTED]@gmail.com*, 62 F. Supp. 3d

1100, 1104 (N.D. Cal. 2014) ("The court is . . . unpersuaded that the particular seize first, search

second proposed here is reasonable in the Fourth Amendment sense of the word."); *Matter of the

Search of Info. Associated with [redacted]@mac.com*, 25 F. Supp. 3d at 6 ("By abusing the two-

step procedure under Rule 41, the government is asking Apple to disclose the entirety of three

months' worth of e-mails and other e-mail account information.  Yet, on the very next page, it

explains that it will only 'seize' specific items related to its criminal investigation; it goes so far

as to name specific individuals and companies that, if mentioned in an e-mail, would make that

e-mail eligible to be seized.  Thus, the government has shown that it can 'describe the items to be

seized with [ ] much specificity'; it has simply chosen not to by pretending that it is not actually 'seizing' the information when Apple discloses it." (citations omitted)); *In re Applications for Search Warrants for Info. Associated with Target Email Address*, No. 12-MJ-8119, 2012 WL 4383917, at *9 (D. Kan. Sept. 21, 2012) ("The Court finds the breadth of the information sought by the government's search warrant for . . . either the fax or email account—including the content of every email or fax sent to or from the accounts—is best analogized to a warrant asking the post office to provide copies of all mail ever sent by or delivered to a certain address so that the government can open and read all the mail to find out whether it constitutes fruits, evidence or instrumentality of a crime."). This is, to be sure, not a universally held view. *See, e.g.*, *Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple*, Inc., 13 F. Supp. 3d 157 (D.D.C. 2014) (vacating denial of subsequent warrant application in D.D.C. case cited above); *supra* page 17 (citing *Kanodia*, 2016 WL 3166370, at *6-7 and *Klyushin*, 643 F. Supp. 3d at 270). But the defense respectfully submits that this Court should follow the persuasive authorities cited above in concluding that wholesale seizure of a defendant's online account records violates the Fourth Amendment particularity requirement.

On the other side of the Constitutional balancing, namely the privacy implications of the search, a great deal has changed since *Upham* was decided in 1999. "Just as customs officers in the early colonies could use writs of assistance to rummage through homes and warehouses, without any showing of probable cause linked to a particular place or item sought," the government's practice of seizing entire electronic accounts belonging to those suspected of criminal wrongdoing improperly results in "automatic access to a virtual warehouse of an individual's most intimate communications . . . without probable cause" tied to those specific

materials. *United States v. Wurie*, 728 F.3d 1, 9 (1st Cir. 2013) (citation omitted); *see also United States v. Lofstead*, 574 F. Supp. 3d 831, 839 (D. Nev. 2021) ("District courts nationwide have begun expressing concerns about over-searching ESI, especially because warrants often authorize the government to seize large quantities of personal information that it lacks probable cause to search."). This runs afoul of the Supreme Court's command to "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *United States v. Jones*, 565 U.S. 400, 406 (2012) (citation omitted).[4]

> **4.    *The enumerated categories of materials to be searched and seized by investigators exceeded the scope of any probable cause and therefore violated the particularity requirement***

Even assuming, contrary to the foregoing, that the particularity requirement does not apply to the initial seizures of Mr. Tompkins's entire email account contents, the categories of materials subject to search listed in the warrants were "so numerous and unspecific to create an [effectively] unrestricted dragnet search." *Lofstead*, 574 F. Supp. 3d at 844 (citation omitted). At best, assuming there was probable cause to believe any crime had been committed, the scope of such probable cause was limited to suspected bribery between Mr. Tompkins and one specific person, Individual A, spanning November 2020 through July 2023. But the scope of the searches purportedly permitted by the warrants is much broader.

---

[4] The defense acknowledges that, in *United States v. Aboshady*, 951 F.3d 1 (1st Cir. 2020), the First Circuit affirmed the defendant's convictions in a case involving execution of a two-step warrant requiring Google to produce all of the data from the defendant's account. But the defendant in that case argued only that the government's retention of the full set of data violated the terms of the warrant itself. *See id.* at 5. The *Aboshady* Court had no occasion to consider whether the initial seizure from Google violated the Fourth Amendment particularity requirement.

With respect to date range, the warrants extend back to 2013 (for Comcast) and 2016 (for Google), notwithstanding the clear lack of any probable cause to believe that any bribery offense occurred prior to 2020 or after July 2023. The various allegations pre-dating 2020 are patently insufficient to establish probable cause. First, Mr. Tompkins's alleged ethical violations, *e.g.*, asking shop owners to take down an opponent's campaign signs and using SCSD employees for childcare, *see* Exhibits A and C ¶¶ 10-11, have nothing at all to do with whether he violated the Hobbs Act or any other federal bribery prohibition. *See United States v. Brissette*, No. 16-CR-10137, 2020 WL 718294, at *1 (D. Mass. Feb. 12, 2020) ("The Hobbs Act does not empower federal prosecutors to use the criminal law to enforce . . . a state code of conduct that itself has no criminal or even civil penalties, or a local government policy."). Second, the mere fact that Mr. Tompkins and Individual A were in communication, and had a business relationship, dating back to 2013 does not establish any wrongdoing pervading that entire time period.[5] Moreover, the affidavits, despite the government presumably having access to this detailed information, make no attempt to itemize how many of the relevant communications or payments by Mr. Tompkins's campaign to Individual A's lobbying company for consulting services pre-dated 2020. In these circumstances, any belief that an offense occurred prior to 2020 can be based on nothing more than impermissible "bare suspicion." *Brinegar*, 338 U.S. at 175.

Ultimately, the basis for the government's assertion of authority to review Mr. Tompkins's email communications dating back more than a decade is the affiant's speculation that "when public officials like [Mr. Tompkins] use their public office to unlawfully enrich themselves, it is usually

---

[5] The Court should reject the government's suggestion that such temporally removed communications, as opposed to contemporaneous ones, would be relevant to determining whether the $50,000 payment in November 2020 was a loan. Exhibits A and C ¶ 37.

not done on an isolated basis." Exhibit A ¶ 43; Exhibit C ¶ 44. But one instance of suspected

bribery by Mr. Tompkins was insufficient to create "probable cause of ongoing or serial criminal

incidents." *Lofstead*, 574 F. Supp. 3d at 840-41. In other words, in making probable cause

determinations, a magistrate may not invariably assume that "some implies more." *United States*

*v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990); *see also United States v. Nora*, 765 F.3d 1049,

1060 (9th Cir. 2014) ("While the police . . . might have probable cause to search for the specific

firearm they observed, they would need evidence tending to show that the suspect in question—

or the class of people to which the suspect belonged—possessed additional firearms to justify a

more expansive search.").

The categories of items subject to search are overbroad for other reasons independent of

the date range. There is, for example, no arguable probable cause to believe that "[a]ll" of Mr.

Tompkins's communications with "the SCSD" would yield evidence regarding the alleged bribe

received from Individual A. Exhibit B at 6; Exhibit D at 7. At all relevant times, Mr. Tompkins

was the leader of the SCSD, and the vast majority of his communications with SCSD personnel

have nothing whatsoever to do with Individual A or Company A. Indeed, the affidavits do not

allege any involvement by other SCSD personnel in the alleged bribes. Similarly, there is no

allegation that Mr. Tompkins communicated with the CCC, OCPF, his own campaign, or the

State Ethics Commission regarding any aspect of the suspected bribery, rendering the warrant's

inclusion of communications with those entities overbroad. As for the SCSD's involvement in

re-entry programs, that fact can be easily viewed on the internet. *See* Massachusetts Sheriffs'
Association, Suffolk County Sheriff's Office (last visited Oct. 17, 2025).[6]

The next category of enumerated materials is equally problematic. A single suspected
bribe involving an equity interest in Company A and subsequent refund of the investment via
five specific checks cannot possibly justify review of "[a]ll [*i.e.*, 11 or 8 years of]
communications about and/or pertaining to [Mr. Tompkins's] finances, lending, borrowing,
expenses, investing, investments, real estate, . . . campaign finances, . . . food, travel, and
entertainment." Exhibits B and D at 7. For reasons set forth *supra*, any suspected "ethics
violations" are clearly beyond the scope of federal bribery laws. *Id.* Communications about "the
CCC, the SCSD, the PIP program, . . . campaign finances, the OCPF, [and] [Mr. Tompkins's]
campaign and/or campaign committee" are beyond the scope of probable cause absent a tie to
Company A or Individual A. Exhibit B at 7.

In short, the warrants at issue here represent quintessential fishing expeditions, seeking to
leverage an isolated incident of suspected bribery to rummage through a public official's emails
for evidence of any other conceivable misconduct. The Fourth Amendment, specifically
intended to proscribe the related evils of general warrants and overbreadth, does not permit the
government to engage in such expansive and unguided forays through a citizen's digital life in an
apparent effort to identify crimes for which it currently lacks probable cause.

The warrants additionally include communications bearing on "[t]he identity, location,
and ownership of any computers used to access" the relevant "e-mail accounts." Exhibit B at 7;

---

[6] *Available at* https://www.masssheriffs.org/suffolk-county-sheriffs-office.

Exhibit D at 8. The defense contends that this provision is overbroad and violates the particularity requirement. The Ninth Circuit, in an opinion that was subsequently withdrawn, recently invalidated a warrant provision purporting to authorize a search of all materials "that would show dominion and control for" seized electronic devices. *United States v. Holcomb*, 132 F.4th 1118, 1124 (9th Cir. 2025). In reaching this conclusion, the Ninth Circuit noted, *inter alia*, that the defendant "never disputed that the computer belonged to him." *Id.* The government also "failed to identify any meaningful limitation on the scope of the dominion and control provision . . . , thereby authorizing the state to open and examine any file from any time period . . . ." *Id.* at 1128. "Because [defendant's] computer contained thousands of files and because the dominion and control provision did not contain any temporal limitations, the examiner simply exercised his unfettered discretion in determining which files to scroll past and which files to open and examine . . . . On that basis alone, . . . the dominion and control provision was insufficiently particular." *Id.* at 1129. While the Ninth Circuit subsequently withdrew the *Holcomb* opinion (with no subsequent opinion having been issued in the case as of this filing), that opinion was consistent with other precedents. *See Millender v. Cnty. of Los Angeles*, 620 F.3d 1016, 1030 (9th Cir. 2010), *rev'd on other grounds* (finding that warrant authorizing search for "[a]rticles of personal property tending to establish the identity of the person or persons in control of the premise" did not authorize search of a "full range of firearm and firearm-related materials"); *United States v. Rettig*, 589 F.2d 418, 421 (9th Cir. 1978) (invalidating search of 2,288 items, including "numerous United States government publications, blank applications for various credit cards, bank brochures, medical and dental records, drug store receipts for a period extending over two years prior to the search, photograph slides, undeveloped film, extensive

25

financial records, credit cards, and travel documents," seized "ostensibly to discover indicia of the residents' identity"). The defense adopts this reasoning and contends that the Fourth Amendment does not permit a construction of the warrant clause relating to "ownership" of Mr. Tompkins's email accounts, very likely to be an undisputed issue, that would grant the government free reign to review otherwise irrelevant communications, far beyond the scope of any probable cause.

**5.**    ***All fruits of the searches should be suppressed***

The Court should reject any claim by the government that the good-faith exception to the Fourth Amendment's general exclusionary rule can salvage these searches. The Supreme Court has made clear that, in order for the exception to apply, "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant . . . must be objectively reasonable." *United States v. Leon*, 468 U.S. 897, 922 (1984). "[A] warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

Suppression also "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* (citing *Franks*). Here, for reasons set forth *supra*, the affidavits reflected three reckless and material omissions in violation of *Franks*, which, in itself, should preclude application of the good-faith exception.

Additionally, the warrants at issue, essentially purporting to authorize seizure of Mr. Tompkins's entire email accounts, were so facially lacking in particularity that no officer could have reasonably presumed they were valid. *See, e.g.*, *Fuccillo*, 808 F.2d at 178. "The defect

26

arises not from a lack of compliance with the Warrant[s'] terms, but from the failure of executing officers to recognize that the Warrant[s] authorize[d] a general search of" Mr. Tompkins's email accounts. *Lofstead*, 574 F. Supp. 3d at 846. "When faced with a warrant that authorizes an unrestricted search . . . , an executing officer behaving in good faith should know that such a search is objectively unreasonable and would likely violate the defendant's Fourth Amendment rights." *Id.* The First Circuit held more than four decades ago that officers may not "seize[] all" records present at the location of a search "in order that a detailed examination c[an] be made later." *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980). Courts have declined to apply the good-faith exception in analogous circumstances. *See United States v. Kow*, 58 F.3d 423, 429 (9th Cir. 1995); *United States v. Winn*, 79 F. Supp. 3d 904, 924 (S.D. Ill. 2015); *United States v. Wecht*, No. 06-CR-26, 2009 WL 10718126, at *29 (W.D. Pa. May 14, 2009) ("Because the Laptop Warrant's description of items to be seized was so patently overbroad as to fail, on its face, to particularize the items to be seized, any reliance on that warrant was objectively unreasonable and the evidence obtained as a result of that search must be suppressed."); *United States v. Fleet Mgmt. Ltd.*, 521 F. Supp. 2d 436, 445 (E.D. Pa. 2007) ("[W]e read Third Circuit precedent to prohibit the use of the good faith exception in connection with general warrants.").

The remedy for a general search is complete, not partial, suppression. *See United States v. Christine*, 687 F.2d 749, 758 (3d Cir. 1982) ("It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed."); *Application of Lafayette Acad., Inc.*, 462 F. Supp. 767, 772 (D.R.I. 1978) (referring to cases ordering only partial suppression as representing "a limited exception to the universal invalidity of general warrants"); *Abrams*, 615 F.2d at 542 (affirming what appears to have been complete suppression order). This is because, "[t]he cost

to society of sanctioning the use of general warrants-abhorrence for which gave birth to the

Fourth Amendment-is intolerable by any measure.  No criminal case exists even suggesting the

contrary." *Christine*, 687 F.2d at 758.  This is consistent with the First Circuit's suggestion that

total suppression may be appropriate "where the lack of . . . particularity infects every category

of documents named in the warrant."  *United States v. Diaz*, 841 F.2d 1, 5 n.2 (1st Cir. 1988); *see*

*also Application of Lafayette Acad., Inc.*, 610 F.2d 1, 6 (1st Cir. 1979) ("Since we determine that

the description of no item is free from fourth amendment difficulties, we do not reach the issue

of severability.").  Here, there can be no doubt that the lack of particularity infected every aspect

at the first step of the two-step warrants, permitting seizure of all documents, without any effort

to ensure a connection to the arguable probable cause.  *See Fuccillo*, 808 F.2d at 178 (affirming

complete suppression where agents seized the "*entire contents*" of warehouse).  Even with

respect to the enumerated categories, the failure to limit the searches to the relevant date range

infected all categories of documents.  In short, "[n]o authority approaches the major drastic

corrective surgery which would be the burden of this Court in an effort to cure the constitutional

maladies from which th[ese]warrant[s] suffer[]."  *Lafayette*, 462 F. Supp. at 772; *see also Winn*,

79 F. Supp. 3d at 926 ("Because the warrant is a general warrant, it has no valid portions.");

*Fleet*, 521 F. Supp. 2d at 446 (finding redaction "not appropriate" where warrant description was

"impossibly broad, arguably encompassing every conceivable document").

Moreover, the deterrence rationale underlying the exclusionary rule requires suppression

of all fruits of the searches.  Mr. Tompkins, like countless other defendants before him, had a

voluminous universe of information, very likely including some of his most intimate personal

communications, seized by the government on suspicion that he had been involved in a single

28

isolated incidence of bribery. The exclusionary rule is intended to prevent such serious and repeated Constitutional infringements. At minimum, even assuming *arguendo* that the warrants here did not amount to general warrants requiring complete suppression, Mr. Tompkins is at least entitled to suppression of materials outside the scope of a provision of the warrant that is expressly found to be supported by probable cause.

**D.    Conclusion**

For the foregoing reasons, the defense respectfully requests that this Honorable Court suppress all evidence seized pursuant to the search warrants for Mr. Tompkins's Comcast and Google email accounts.

<u>**COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**</u>

Undersigned counsel conferred with the government, and the government opposes the relief requested in this Motion.

Respectfully Submitted,
STEVEN TOMPKINS
By His Attorney,

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: October 20, 2025

29

**<u>CERTIFICATE OF SERVICE</u>**

I, Martin G. Weinberg, hereby certify that on this date, October 20, 2025, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**<u>/s/ Martin G. Weinberg</u>**
Martin G. Weinberg, Esq.