UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN WAYNE TOMPKINS,<br>Defendant | ) | No. 25-CR-10334-MJJ |

**DEFENDANT'S MOTION TO ADMIT EXHIBITS**

Now comes the defendant Steven Tompkins, by and through undersigned counsel, and hereby respectfully moves this Honorable Court to admit his objected-to exhibits (listed in Exhibit 1 to this Motion). Like the government in its analogous motion, the defense makes this submission "in an effort to streamline the introduction of evidence" at trial. Dkt. 145 at 1.

**MEMORANDUM OF LAW**

**I. Mr. Tompkins's Contemporaneous Communications with Mr. Perullo Are Relevant and Admissible to Disprove the Alleged Extortion (Exhibits UU, VV, WW, XX, YY, ZZ, AAA, BBB, CCC, EEE)**

As set forth in a prior filing, many of the exhibits that the government objects to are contemporaneous communications between Mr. Tompkins and Frank Perullo, the named victim in this case, which occurred during or close to the very same time period that the government alleges Mr. Tompkins was extorting Mr. Perullo (between 2019, the year of the alleged "official act," and 2023, the year of the final repayment of Mr. Tompkins's investment). *See* Dkt. 143 at

10-11 (citing as examples Exhibits XX, YY,[1] ZZ, and EEE); Exhibit WW (March 2021 group message including Mr. Tompkins and Mr. Perullo joking about Mr. Tompkins's vacation and relationship status within months of the alleged extortion charged in Count One); Exhibit AAA (April 2022 text messages about Mr. Tompkins's campaign t-shirts with Mr. Perullo saying, "Need one[.] I need your face on my chest" occurring just about one month before the initial repayment to Mr. Tompkins of his investment underlying the Count Two extortion charge); Exhibit BBB (June 2022 message between Mr. Tompkins and Paul Scapicchio, Mr. Perullo's business partner, saying happy Father's Day). In perhaps the most poignant example, on September 6, 2022, just three days before Mr. Tompkins allegedly extorted him into writing an additional $12,500 check, and only months after the allegedly extorted May 2022 check, Mr. Perullo sent an email advocating support for Mr. Tompkins's re-election, stating, *inter alia*, "Steve has been a friend of mine for nearly twenty years" and "I am proud to call him a friend . . . ." Exhibit UU. Other exhibits show a continuing friendly relationship into 2024, even after the alleged extortion had been completed and during the same year Mr. Perullo began cooperating with the government. *See* Exhibit VV (April 2024 text messages between Mr. Tompkins and Mr. Perullo about having dinner together);[2] Exhibit CCC (text messages about Mr. Tompkins and Mr. Perullo having dinner together and Mr. Tompkins taking file cabinets).

The government notably "does not dispute that the nature of [Mr. Tompkins's] and

[1] With respect to Exhibit YY, the defense seeks to introduce the October 12, 2021 message. If the government's objection is to the September 25, 2021 messages, the defense is prepared to redact out that portion of the Exhibit.

[2] The government's objection to this exhibit on authentication grounds, Fed. R. Evid. 901(a), should be rejected at this stage. The defense has the opportunity to lay a foundation for the admissibility of the exhibit at trial.

Perullo's relationship could be relevant to the defense," but nonetheless objects, claiming that "[t]he small subset of exhibits to which the government does object are those that are blatantly propensity evidence." Dkt. 144-1 at 3. The government's concession on this issue facially defeats its relevance objections under Fed. R. Evid. 401. The government also never explains how, *e.g.*, an email advocating support for Mr. Tompkins's campaign, a picture of Mr. Tompkins in uniform, or a picture of a campaign t-shirt constitutes propensity evidence, or direct statements by the alleged extortion victim that the charged defendant is his trusted friend, *see, e.g.*, Exhibit UU, much less "blatantly" so. The jury will, of course, be well aware of Mr. Tompkins's position as Sheriff, and the fact as to Exhibit UU and AAA that he was running for re-election in 2022.

The government's objections to some of these exhibits under Fed. R. 802 (hearsay) are specious and not responsive to the foregoing and previously disclosed defense theory of relevance. For example, Exhibit UU is not being offered primarily to establish the truth of any matters asserted (*i.e.*, that Mr. Perullo was, in fact, proud to call Mr. Tompkins a friend), but instead as an expression of Mr. Perullo's then existing state of mind at the very time he now claims he was exported by Mr. Tompkins. Further, the mere fact that Mr. Perullo was advocating for others to vote for Mr. Tompkins and calling him a dear friend of 20 years at the same time he now claims Mr. Tompkins was extorting him is, standing alone, powerful exculpatory evidence. *See* Fed. R. Evid. 801, advisory committee notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay"). Extortion allegations make the state of mind of the alleged victim of unique significance and the government contends Mr. Tompkins's

statements to Mr. Perullo caused Mr. Perullo to fear economic harm. *See* Dkt. 130 (Govt. Trial Br.) at 3-5. The exhibits offered that demonstrate Mr. Perullo's statements of friendship and support for Mr. Tompkins during the very same time period are admissible because of the relevance of the witness's then existing state of mind (*i.e.*, these are not after the fact statements about friendship but contemporaneous, un-induced, voluntary, reliable statements reflecting the true state of mind of the government's cornerstone witness). A statement, for instance, by Mr. Perullo, a well known businessman that he wants to wear a t-shirt with the photograph of Mr. Tompkins within weeks of claiming he was victimized by Mr. Tompkins's demands for repayment, is both exculpatory and reflective of a highly material state of mind inconsistent with his claims of being a victim afraid of Mr. Tompkins. The government is free to argue that his statements about friendship and support are not irreconcilably inconsistent with his claims of being a fearful victim but not free to have the evidence of friendship when it is direct and comes from Mr. Perullo's own texts and emails excluded.

## II. Mr. Perullo and Andrea Cabral's Knowledge of Mr. Tompkins's Longstanding Commitment to Offender Re-Entry Programs Is Relevant to Whether Mr. Perullo and/or Ascend Harbored Any Subjective Fear and the Reasonableness of Any Such Fear (Exhibits QQ, RR, SS, JJJ, and RRR)

As previously explained, several of the exhibits objected to by the government establish Mr. Perullo's and Andrea Cabral's knowledge of Mr. Tompkins's longstanding commitment to offender re-entry programs. *See* Dkt. 143 at 6-7 (citing as examples Exhibits QQ, RR, SS, JJJ, and RRR). Ms. Cabral was the CEO of Ascend's Massachusetts operation, and the initiator of the re-entry hiring agreement between Ascend and the Suffolk County Sheriff's Department ("SCSD"). Ascend's participation in the Common Ground Institute ("CGI") program, was established through Ms. Cabral and Mr. Tompkins. *See* Exhibit 158 (Sept. 5, 2019 letter). Mr.

Perullo, for his part, had worked on Mr. Tompkins's political campaigns and was personally familiar with Mr. Tompkins and his priorities as Sheriff, including the importance Mr. Tompkins placed on the CGI and offender re-entry programming. *See* Exhibit JJJ. Evidence demonstrating both Ms. Cabral's and Mr. Perullo's knowledge of Mr. Tompkins's longstanding commitment to re-entry programming therefore bears directly on whether Mr. Perullo could reasonably have feared that Mr. Tompkins would prohibit Ascend from continuing to participate in the CGI and whether Mr. Perullo could reasonably have feared that Mr. Tompkins would withdraw from an agreement he had reached with his close friend Ms. Cabral.[3] Again, the government's character and hearsay objections fail. For example, the government objects to Exhibit QQ, a draft press release regarding Mr. Tompkins's appointment as Sheriff. The document contains a statement by Ms. Cabral, who is copied on the email, praising Mr. Tompkins for, *inter alia*, his development of "innovative reentry rehabilitation programs including the [CGI] to train inmates in carpentry, custodial maintenance, painting and landscape to prepare them for employment in the outside world." These statements are not being offered to prove any good acts by Mr. Tompkins extrinsic to the charges here or to prove the truth of the underlying statements. Rather, Ms. Cabral's mere receipt of this statement attributed to her (and to which she did not object) is relevant to show her knowledge of Mr. Tompkins's deep background in re-entry

---

[3] The government's attempt to equate the evidence of Mr. Tompkins's prior involvement in offender re-entry programs with his alleged ethical violations is unconvincing. As previously discussed, and the government does not address, Mr. Tompkins's creation of and commitment to the CGI, the very program giving rise to the sole alleged official act underlying the government's Hobbs Act extortion allegations, is intrinsic to this case. The same cannot fairly be said of the factually inapposite conduct that the government seeks to introduce, namely Mr. Tompkins's allegedly asking for a political opponent's campaign signs to be taken down and using SCSD staff (including his niece) for childcare.

programs and the CGI and the likelihood he would consent to her request that Ascend participate by hiring re-entering inmates. A similar analysis applies to Exhibits RR and SS, emails reflecting draft campaign statements on which Mr. Perullo was copied which reference Mr. Tompkins's work on re-entry programs, among other things.

## III. Several Exhibits Are Relevant to Mr. Tompkins's Close Relationship with Ms. Cabral, which Is Probative of Whether Mr. Tompkins Threatened to Harm Ascend, and Whether Mr. Perullo and Ascend Reasonably Feared Such Harm (Exhibits GGG, HHH, NNN)

Again, as the defense has previously explained, a third category of exhibits are relevant and admissible to show the close relationship between Mr. Tompkins and Ms. Cabral dating back more than four decades to their time in college together. *See* Dkt. 143 at 9 (citing Exhibits GGG, HHH, and NNN as examples). Mr. Tompkins's close relationship with Ms. Cabral is relevant to whether or not Mr. Tompkins, as the government alleges, made extortionate threats to harm her business and unilaterally rescind an agreement reached 1:1 with Ms. Cabral.

## IV. Remaining Objected to Exhibits Are Relevant and Admissible (Exhibits III, KKK, LLL, MMM)

The government objects to Exhibit III, a June 2018 *Boston Globe* article, on relevance and hearsay grounds. The article, entitled *Andrea Cabral envisions prison-to-pot-jobs pipeline*, is the very reason that Mr. Tompkins's executive assistant placed his signature on the September 2019 letter drafted by Ms. Cabral memorializing the SCSD's relationship with Ascend. *See* Exhibit 157 (Sept. 5, 2019 email from Ms. Cabral reflecting Cannabis Control Commission's ("CCC") request for a letter and stating, "[t]he Sheriff is on board [with] the collaboration and spoke to the media about it last year"). In this sense, the article is intrinsic to the charges separate and apart from the truth of any matters asserted therein. Additionally, the article is

relevant to Mr. Tompkins's state of mind and belief that Ascend had other means of satisfying the positive impact plan ("PIP") requirement. *See* Exhibit III at 3 ("Cabral's long-term vision is much more expansive. She hopes to use her political and law enforcement connections to build a larger jobs program between the marijuana industry and the state's courts and probation systems."). This basis of relevance is independent of the truth of the statements contained in the article.

The government objects to Exhibit KKK, a transcript of an August 2021 Ascend earnings call, on relevance and hearsay grounds. The document is clearly relevant. Ascend's Chairman, Founder & CEO Abner Kurtin states, "[d]uring the quarter, Ascend doubled down on our commitment to the Last Prisoner Project. Following the early completion of our initial pledge made to the Last Prisoner Project, Ascend committed to a second pledge. Ascend retail locations currently ask customers to voluntarily donate $1 to LPP at checkout with a corporate match for each dollar donated up to $250,000 for a total of $500,000." Exhibit KKK at 4. There is no mention of the SCSD or the CGI program. This undermines the government's allegation that Mr. Perullo reasonably feared for Ascend's continued licensure in the hypothetical event that the SCSD terminated Ascend's ability to participate in the CGI program. The government's relevance objection to this exhibit stands in direct contravention of its assertions that other CCC-related exhibits "are the very crux of what this case is about" and that "[e]vidence regarding Ascend's efforts to raise capital contributions is highly relevant to the charges in this case." Dkt. 145 at 2, 4. As for the hearsay objection, the defense contends that the earnings call transcript is a business record of Ascend and reserves the right to lay a foundation for its admissibility at trial.

*See* Dkt. 108 at 2; Dkt. 117.[4]

The government objects to Exhibits LLL and MMM, a defense subpoena to the CCC and the CCC's corresponding response, on relevance and Rule 403 grounds. The subpoena called for production of "[d]ocuments that identify any Licensee that, between January 1, 2019 and December 31, 2023, was suspended, placed on probation, formally reprimanded, issued a written warning or notice of violation, otherwise formally sanctioned, or de-licensed by the Commission where one of the stated grounds, in whole or in part, was failure to meet, implement, or satisfy PIP Requirements." Exhibit LLL at 4. The CCC response stated that "no records were located in the possession, custody, or control of the CCC that were responsive to the subpoena during the time period at issue." Exhibit MMM at 2. The fact that the CCC never took action against a single licensee for failure to comply with the PIP requirement significantly undermines the government's allegation, crucial to its prosecution of Mr. Tompkins, that Mr. Perullo reasonably feared economic harm if the SCSD terminated Ascend's ability to participate in the CGI program. The government, for its part, expressly seeks to introduce documents on the grounds that they "demonstrate how stringent the CCC's licensing requirements were, and that applications were not rubber stamped." Dkt. 145 at 3. The defense must, by the same token, be permitted to introduce evidence undermining this government characterization.

---

[4] Alternatively, the defense will offer Ascend's own September 27, 2021 press release (attached hereto as Exhibit 2), entitled "AWH Reaches $1M Milestone in Contributions to Last Prisoner Project," which was prepared and submitted by Ascend and plainly qualifies as a business record of the company. The release announced that Ascend had reached $1 million in contributions to the Last Prisoner Project and described that organization as dedicated, among other things, to "re-entry programs." Ascend's substantial and independently documented commitment to re-entry and criminal-justice reform—wholly apart from its participation in programs with the SCSD further undermines any claim that Mr. Perullo could reasonably have feared that termination of the SCSD relationship would jeopardize Ascend's licenses.

Respectfully Submitted,
STEVEN TOMPKINS
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: August 14, 2026

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, August 14, 2026, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.